[No. 5636. Decided September 11, 1905.]

THE STATE OF WASHINGTON, *on the Relation of the City of Port Townsend, Plaintiff,* v. C. W. CLAUSEN, *as Auditor of the State of Washington, Respondent.*[1]

SCHOOLS—PERMANENT SCHOOL FUND—INVESTMENT—PROPRIETY OR SAFETY — DETERMINATION OF STATE LAND COMMISSIONERS. The determination of the board of state land commissioners as to the propriety and safety in investing the permanent school fund is conclusive on the state auditor and on the courts, when not impeached for bad faith or fraud.

STATES—FINANCIAL MANAGEMENT — INVESTMENT OF PERMANENT SCHOOL FUND—MUNICIPAL BONDS—DEFINITION—CITY BONDS PAYABLE OUT OF SPECIAL FUND—CREATED BY RECEIPTS OF WATER WORKS SYSTEM—GENERAL CREDIT OF CITY NOT PLEDGED. Bonds issued by a city under Laws 1901, p. 177, to defray the cost of the construction of waterworks, which are payable only out of a special fund derived from the revenues of the waterworks system, and for which the city is not in any way liable, are not municipal bonds within the meaning of Const., art. 16, § 5, authorizing the investment of the permanent school fund in municipal bonds, as such provision contemplates the protection of the permanent school fund by investment in bonds secured by a pledge of the credit of the municipality.

Application filed in the supreme court April 18, 1905, for a writ of mandamus to compel the state auditor to issue a warrant on the permanent school fund of the state in payment for bonds accepted as an investment by the board of state land commissioners. Writ denied.

*Coleman & Ballinger, Vance & Mitchell,* and *G. M. Emory,* for relator, upon the point that "non-liability" bonds are municipal bonds within the meaning of the constitution, cited: *United States v. Ft. Scott,* 99 U. S. 152, 25 L. Ed. 348; *United States v. County of Macon,* 99 U. S. 582, 25 L. Ed. 331; *Bates v. Gerber,* 82 Cal. 550, 22 Pac. 1115;

[1]Reported in 82 Pac. 187.

*Walker v. Board of Com'rs,* 11 Ind. App. 285, 38 N. E. 1095; *Strieb v. Cox,* 111 Ind. 299, 12 N. E. 481; *Clapp v. Otoe County,* 104 Fed. 473; *Rodman v. Munson,* 13 Barb. 63; *Newell v. People ex rel. Phelps,* 7 N. Y. 9.

*Frank C. Owings, E. C. Hughes,* and *Hughes, McMicken, Dovell & Ramsey,* for respondent, to the point that a "non-liability" bond is not contemplated by the constitution as a municipal bond, cited: *Appleton Waterworks v. Appleton,* 116 Wis. 363, 93 N. W. 262; *State ex rel. Board etc. v. McMillan,* 12 N. D. 280, 96 N. W. 310.

FULLERTON, J.—This is an application for a writ of mandamus, instituted by the city of Port Townsend against C. W. Clausen, as auditor of the state of Washington, to compel him to draw a warrant upon the state treasurer in payment of certain bonds, purchased by the board of state land commissioners as an investment for the permanent school fund. That the nature of the controversy between the parties may be understood, it is necessary to make a brief statement of the facts out of which it arises.

By the act of March 16, 1901 (Laws 1901, p. 177), the legislature of the state of Washington enacted that, whenever the city council or other corporate authority of a city shall deem it advisable to exercise the authority conferred upon cities in relation to water works, sewerage, and works for lighting, heating, fuel and power purposes, or any or all of these, the city council or other corporate authority shall provide therefor by ordinance in which a system or plan for the proposed work shall be adopted and the costs thereof estimated as near as may be, all of which shall be submitted to the qualified electors of the city or town, at a general or special election, for ratification or rejection. The act further provides that, if an indebtedness is to be created by the construction of the proposed public works, such indebtedness and the amount thereof shall likewise be

stated in the ordinance, and be assented to by the qualified voters of the municipality—a majority vote being necessary to adopt the proposed plan, while the authority to become indebted must be assented to by three-fifths of the qualified voters voting at such election.

Two forms of indebtedness are provided for in the act. The one provides for a general indebtedness of the city, for which general municipal bonds may be issued to an amount not exceeding five per centum of the taxable property of the city, as shown on the last assessment roll made for municipal purposes. The other form is best described in the words of the act itself; namely,

"(b) A special fund may be created for the sole purpose of defraying the cost and expense of construction or acquirement of each class of improvements or lands contemplated, or any condemnation thereof, together with such interest as shall accrue upon the obligations issued therefor, into which said funds the authorities of said city or town may obligate and bind the city or town to set aside and pay a fixed proportion of the revenue or proceeds to be derived from the plan or system, lands or uses of which the said improvement forms the whole or part, so long as any obligations are outstanding against said fund. In fixing said proportion, the authorities of such city or town shall have due regard to the cost of operation and maintenance of the plan or system as constructed or added to, and shall not set aside into the special fund a greater proportion of the revenue and proceeds than, in their judgment, will be available over and above such cost of maintenance, and operation. The city or town authorities may from time to time, by ordinance, transfer to any such special fund any other available funds of said city. Bonds or warrants may be issued against any such special fund to the amount of the cost or charges to be met therefrom. Such bonds or warrants shall be issued in denominations of not less than one hundred and not more than one thousand dollars, shall be numbered from one up consecutively, and shall bear interest not exceeding six per cent, payable semi-annually, the principal of any such bonds being payable upon call of the

7—40 WASH.

city or town treasurer in the order of their numbers whenever there is in such special fund, after payment of interest on all outstanding bonds or warrants, a sufficient balance to pay the same. And any such bonds or warrants issued against any special fund as herein provided shall be a valid claim of the holder thereof only as against the said special fund, and the fixed proportion of special revenues obligated to be set aside therein, and shall not constitute an indebtedness of such city or town within the meaning of the constitutional provisions and limitations. The principal and interest of any such bonds or warrants shall be made payable at such place as may be designated. Each such bond or warrant shall state upon its face that it is payable from a special fund, naming the said fund and the ordinance creating it. Said bonds or warrants shall be printed, or engraved or lithographed on good bond paper, and a duly authenticated copy of this act, together with the whole or a summary of the ordinances of the city or town authorizing and directing the submission of such plan or system to the qualified voters of such city or town for ratification or rejection, and creating the special fund, shall be printed on each such bond or warrant, together with a printed copy of a signed statement by the mayor and clerks showing the result of such election. Said bonds or warrants shall be sold in such manner as the corporate authorities shall deem for the best interest of the city or town, or the corporate authorities may provide in any contract for the construction or acquirement of the proposed improvement that payment therefor shall be made only in such bonds and warrants at par value thereof. A register shall be kept of all bonds and warrants, which register shall show the number, date, amount, interest, name of payee and where payable, of each and every bond or warrant issued or sold under the provisions of this subdivision. Upon the creation of any such special fund and the issuance of any such obligation against the same, the fixed proportion of revenue shall be set aside and paid into said special fund as provided in the ordinance creating said fund, and in case any city or town shall fail to thus set aside and pay such fixed proportion as aforesaid, the holder of any bond or warrant against such special fund may bring suit or action against the city or town and compel such setting aside and payment." Laws 1901, p. 179.

Acting under and in pursuance of this statute, the city of Port Townsend, on February 16, 1904, duly passed an ordinance adopting a system and plan for supplying "the city and its inhabitants, Fort Warden and Fort Flagler, and other persons, within and without the city, with water, declaring the estimated cost thereof, and creating an indebtedness in the sum of two hundred and fifty thousand dollars." The ordinance provided for the creation of a fund, called therein "The Olympic Gravity Water Works Fund of Port Townsend," into which it was proposed to pay seventy-five per centum of the gross receipts of the water works plant, when completed, and such further sum as the city of Port Townsend should, from time to time, by ordinance, transfer from the receipts of the plant or from its general revenues.

For the purpose of acquiring funds to construct the works, it was proposed by the ordinance to issue bonds against, and payable solely out of, this special fund, in the sum of two hundred and fifty thousand dollars, in denominations as fixed by the statute, and payable at the call of the city treasurer, the same to bear interest not to exceed six per centum per annum, payable semi-annually; such bonds to be sold in such manner and at such rate of interest, not exceeding six per centum, as the city council should deem to the best interest of the city. In short, it was the purpose of the city authorities to provide for the construction of a system of water works for the benefit of the city, and to pay for the same out of a special fund, derived from the revenues of the system when completed, in accordance with the terms of the statute above cited.

The plan proposed by the ordinance was thereafter submitted to the qualified electors of the city of Port Townsend, and was ratified and adopted by the requisite majorities of the electors voting at such election. Bonds were subsequently issued pursuant to this authorization, and on March 20, 1905, the proper city authorities of the city of Port Townsend tendered the bonds to the state of Wash-

ington, as an investment for its permanent school fund. The board of state land commissioners, in whom the statute vests the power to invest this fund, accepted the tender, and by resolution as by law required, directed that the entire issue be purchased at the par value thereof; and that one hundred and fifty thousand dollars of the amount of such purchase be taken and paid for immediately, and the balance within six months from that date. The city thereupon tendered the bonds to the state auditor, and demanded that he issue to it a warrant on the state treasurer, for the sum of one hundred and fifty thousand dollars. The auditor refused to issue the warrant, and these proceedings were instituted to compel him so to do.

The auditor, in his return to the alternative writ, bases his refusal to issue the warrant on several grounds, the principal one, and the only one we have found it necessary to consider, being that the attempted investment is in violation of art. 16, § 5, of the state constitution, which, as amended in 1894, provides that "none of the permanent school fund of this state shall ever be loaned to private persons or corporations, but it may be invested in national, state, county, municipal or school district bonds."

Before proceeding to a notice of the questions argued, however, it is well to state that the contention of the auditor to be here considered raises no question as to the propriety or safety of the proposed investment, and that no such question will be discussed. The authority to determine whether a proposed investment of the permanent school fund is proper or safe is vested by law in the board of state land commissioners, and the determination of that board, unless impeached for bad faith or fraud, is conclusive alike upon the auditor and the courts, no matter how strongly he or they may be convinced of the unwisdom of the board's action. It may be properly stated here, also, that it is set forth in the return of the auditor, and it stands conceded in the record, that the city of Port Townsend was, at the time it

caused the bonds in question to be issued, indebted to the full limit fixed by the constitution, and was without power to incur a further valid general indebtedness, unless, perhaps, for the purchase of actual necessities.

The first question discussed by the parties relates to the nature of the prohibition contained in this section of the constitution. The relator contends that it was intended to mark a distinction between public and private securities, and forbid the investment of the fund in private securities only, leaving the board free to make investments in any form of public securities that they, in the exercise of their discretion, might select. The auditor, on the other hand, contends that the section in question not only prohibits the investment of this fund in private securities but also defines the character of public securities in which it may be invested, and prohibits its investment in any other.

It seems to us that the auditor's contention is the correct one. While a constitution, like any other written instrument, is entitled to a construction in accordance with the intent of its makers, its language, more than that of any other written instrument, is to be taken in its natural and popular sense.. Its makers are the people who adopt it. Its language is their language. And when words, phrases, or sentences are used which have both a technical and popular meaning, the former must give way to the latter, unless, of course, the very nature of the subject indicates, or the context suggests, that they are used in their technical senses. Giving the language of this section its natural and popular meaning, it seems to us that it contains both a prohibition and a limitation. It prohibits the loaning of the permanent school fund to private persons and corporations, and limits the securities in which it may be invested to the bonds of the several municipalities therein enumerated.

It may be true, as the relator argues, that, if the last clause of the sentence composing the section is to be held to limit the securities in which the fund may be invested,

it contains in itself a prohibition against loaning it to private persons or corporations, and the first clause would be rendered useless. But the same argument can be made against the relator's contention. If it be true that the purpose was to prohibit the loaning of the fund to private persons and corporations, that purpose is expressed by the first clause of the section, and the latter is superfluous. No solution of this difficulty is found, therefore, in adopting this line of reasoning. The truth is that the natural meaning of the one clause trenches upon the natural meaning of the other, that the clauses are in a certain sense tautological, and this fact must be recognized while endeavoring to arrive at their true meaning. Recognizing this fact, and giving effect to the whole of each clause, the natural and obvious conclusion is that it prohibits the loaning of the fund to private persons and corporations, and limits the public securities in which it may be invested to national, state, county, municipal, and school district bonds.

But the relator says that the case of *State ex rel. School District No. 24, v. Grimes,* 7 Wash. 270, 34 Pac. 836, is contrary to this conclusion. We do not so understand it. While the court held in that case, passing on this section of the constitution prior to the amendment of 1894, that the term "municipal bonds" as used therein included school district bonds, it did not deny that the clause defining the securities in which the permanent school fund might be invested was a limitation upon the power to invest the fund. On the contrary, it expressly stated that this clause was a limitation upon that power, confessing at the same time that such a construction rendered the special prohibition in a measure useless. But if this case left the question uncertain in that regard, it was set at rest by the subsequent case of *State ex rel. Hellar v. Young,* 21 Wash. 391, 58 Pac. 220. There the question was squarely presented whether the legislature could authorize the investment of the permanent school fund in public securities other than

those enumerated in the section of the constitution now under consideration. It was held that it could not, and that a statute authorizing its investment in state warrants was unconstitutional and void.

The relator contends further that, if it is held that the constitution has limited the securities in which the permanent school fund may be invested to national, state, county, municipal, and school district bonds, these bonds are "municipal bonds" within that limitation. It is said, that the supplying of water to the inhabitants of a municipality, for domestic and other purposes is within the general powers of the municipality, it is a public purpose, and obligations created for that purpose are of necessity public and municipal obligations, no matter whether the provisions made for paying them binds the municipality generally, or binds only some special fund created by the municipality for that purpose; and that when these obligations take the form of bonds they are of necessity municipal bonds. But, if it be true at all that bonds issued by a municipality, which are payable out of a special fund created for that purpose, are municipal bonds, it is true only in a limited and qualified sense; they are such merely because the municipality is instrumental in procuring their issuance, not because they constitute obligations of the municipality. The question before us, however, is much narrower than this line of reasoning would indicate. The question is not whether bonds of this special and limited character may properly be called municipal bonds, but is rather, are they municipal bonds within the meaning of that term as used in the constitution.

It may aid our understanding of the meaning of this section to take a short review of the origin and history of the fund with which it deals. Our permanent school fund, as is well known, is derived, in its greater part, from lands granted the state by the general government. The practice of reserving and setting apart for the use of the public

schools certain portions of the public domain had its origin in the earliest times. By the ordinance of May 20, 1785, which was the first enactment that authorized the disposal by sale of the public lands in the northwest territory, "Lot No. 16" in each township was reserved for the use of schools. Article III of the ordinance of July 13, 1787, declared that "Religion, morality and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged;" and, by the ordinance of July 23, of the same year, "Lot No. 16," in every township was granted for school purposes. This policy became the fixed and settled policy of the government immediately after the adoption and ratification of the federal constitution, its earliest development in practical legislation being found, perhaps, in the act of April 30, 1802, the enabling act under which Ohio was admitted as a state into the Union. In that act certain propositions were offered by the United States to the people of the incipient state, "for free acceptance or rejection," the first of which was,

"That the section number sixteen, in every township, and where such section has been sold, granted or disposed of, other lands equivalent thereto, and most contiguous to the same, shall be granted to the inhabitants of such township, for the use of schools."

In all laws passed subsequent to this act relating to the primary disposition of the soil, section number 16, in every township, has been reserved from sale for the use of schools, and in the acts authorizing the admission of new states into the Union, these sections have been granted to the state for that purpose. The act creating the territory of Washington, made a like reservation, the reservation, however, including section thirty-six as well as section sixteen; and, when the territory was admitted as a state, these sections were granted it for use of the common schools. But so solicitous was Congress for their preservation and main-

tenance, that it annexed a condition to the grant to the effect that the land so granted should not be sold for less than ten dollars per acre, and that the proceeds thereof when sold should constitute a permanent school fund, the interest only of which should be used in support of such schools.

The framers of our constitution carried out the evident wishes of Congress in this respect, in both letter and spirit. They not only made ample provision for the education of the children residing within the state, but were equally solicitous for the preservation of the permanent school fund. Article IX of the constitution is devoted entirely to the subject of education. Section 1 of that article declares that it is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex; and section 2, that the legislature shall provide for a general and uniform system of public schools. Section 3 provides that the principal of the common school fund shall remain permanent and irreducible; and section 5, that all losses to the fund which shall be occasioned by defalcation, mismanagement, or fraud, of the agent or officers controlling or managing the same shall be audited by the proper authorities of the state, and that the amount so audited shall be a permanent funded debt against the state in favor of the fund, and shall not be counted as a part of the indebtedness authorized and limited elsewhere in the constitution. Then follows, in a subsequent article and section, the provision for investing the fund—the provision in question here.

In the light of the care with which this fund has been nurtured and garnered, it would seem there was no escaping the conclusion that the framers and adopters of the constitution intended to define and fix irrevocably the character of the securities in which the fund might be invested. Doubtless they prohibited the loaning of the fund to private persons and corporations, and selected only the securities of gov-

ernmental agencies for its investment, because the latter, having a perpetual existence, are able to recuperate and acquit themselves of their financial obligations no matter how severely they may be racked by panics and financial depressions, while the former have not such recuperative powers. The words they used to define the securities in which the fund might be invested must, therefore, have had in their minds a fixed and definite meaning. By the terms "national, state, county, municipal, and school district bonds," they must have meant instruments which were then generally known to be such; instruments which the common mind then understood to be defined by those terms. This conclusion does not, as the relator seems to argue, confine the investment of the fund to bonds in existence at the time of the adoption of the constitution. The terms used do not name particular instruments, nor were they so intended, but they do, and were intended to, define instruments of a certain kind and character; the terms are descriptive as well as denominative.

The question then is, are bonds issued under the direction of a municipality, payable solely out of a special fund created by it, and for the payment of which its general credit is not pledged or otherwise bound, municipal bonds within the meaning of that term as used in the constitution. We answer unhesitatingly that they are not. Bonds of this character are of comparatively recent origin. At the time of the adoption of the constitution, they were practically unknown. No text work on municipal securities then in existence contained a discussion of them, and but few, if any, courts had then been called on to pass upon their constitutionality. They are the outgrowth of recent municipal exigencies. Hedged in as these corporations are by constitutional limitations as to the amount of indebtedness they can lawfully incur, they have been compelled, in order to procure some needed public conveniences, to resort to pledges of the income to be derived from the conveniences when con-

structed, and even the conveniences themselves, to raise the funds necessary for their construction.

But notwithstanding it may be true that it has become the settled doctrine of the courts that the legislature may lawfully authorize the issuance of such pledges, prescribe their form, and give them such name as it chooses, it does not follow that they are lawful investments for the permanent school fund. The fact alone that they were unknown at the time of the adoption of the constitution precludes the possibility of their having been included in any definition used in that instrument; but, more than this, the very term "municipal bond" precludes the idea that bonds of the character above mentioned can be bonds such as the constitution describes. The term itself imports a municipal debt or obligation. The common mind understands from the fact that a municipal bond is issued that a municipal debt has been created, and that the faith and credit of the municipality issuing the bond is pledged to its payment. The term, it seems to us, can admit of no other definition. Certainly it cannot have been so loosely used as to include every form of obligation that the ingenuity of the legislature might devise and call municipal bonds; yet, if bonds payable out of a special fund are such simply because a municipality is instrumental in creating that fund, this proposition must stand admitted, for there is no limitation upon the power of the legislature to authorize the creation of special funds by municipalities, nor is there any limitation as to the source from which the money to create the special fund may be drawn. Indeed, if bonds of the character here described are municipal bonds, there can be no form of obligation, either public or private, in which the legislature might not, by the legerdemain of making it a municipal special fund, lawfully authorize the investment of the permanent school fund. Such was not the intention of the constitution makers, and we cannot so hold.

Measured by these tests, the bonds in question are clearly

not municipal bonds in which the board of state land commissioners are authorized to invest the permanent school fund. Not only does the statute law which authorizes their issuance, and the ordinance which carries that authorization into execution, expressly declare that the bonds are not obligations of the city of Port Townsend, but it is shown that, if by any form of reasoning they could be held so to be, they would be void for want of power on the part of the city to incur such an obligation. That municipality neither could, nor did, pledge its credit for their payment, and, as we have shown, without such pledge they cannot be "municipal bonds" within the meaning of that term as used in the constitution.

The application for the writ is denied.

MOUNT, C. J., HADLEY, RUDKIN, CROW, ROOT, and DUNBAR, JJ., concur.