(No. 6116.  May 26, 1934.)

FRANKLIN GIRARD, Secretary of State of the State of Idaho, Plaintiff, v. BEN DIEFENDORF, Commissioner of Public Investments of the State of Idaho, Defendant.

[34 Pac. (2d) 48.]

W. H. Langroise, Sam S. Griffin and James F. Ailshie, Jr., for Plaintiff.

468

Maurice H. Greene, Sam Blaine and Z. Reed Millar, for Defendant.

HOLDEN, J.—This is an original application for an alternative writ of prohibition.

September 11, 1933, Springfield School District No. 57, Bingham county, issued a certain tax anticipation negotiable note, in the following words and figures, to wit:

"UNITED STATES OF AMERICA
"STATE OF IDAHO

"1500.00                                        6%

"TAX ANTICIPATION NEGOTIABLE NOTE

"Springfield, Idaho, Sept. 11, 1933, FOR VALUE RE-CEIVED The Trustees of Springfield School Dist. 57, Bingham County, Promises to pay to the Department of Public Investments of Idaho, in the City of Boise, Idaho, on the first day of July, 1934, the sum of Fifteen Hundred & no/100 DOLLARS ($1500.00) with interest from date of warrant issued in purchase at the rate of six per cent (6%) per annum until paid. This note is issued in pursuance of a resolution duly adopted by the Trustees of Springfield School Dist. No. 57, Bingham County, on the eleventh day of September, 1933. IT IS HEREBY CERTIFIED AND RECITED THAT each and every act, condition and thing required to be done, to have happened and to be performed precedent to and in the issuance of this note, has been done, has happened and has been performed in full and strict compliance with the Constitution of the State of Idaho and the provisions of Chapter 160 Idaho Session Laws of 1933 and amendments thereto, and that this note is within every debt and other limit prescribed by law, and the faith and credit of Springfield Dist. 57, Idaho, is hereby

irrevocably pledged to the punctual payment of the Principal and Interest of this note, according to its terms. IN WITNESS WHEREOF, the Trustees of Dist. 57, Bingham Co., State of Idaho, by its trustees in legal session, has caused this note to be signed by the Chairman and trustee attested and the corporate seal to be hereunto affixed by the Clerk of said Springfield School Dist. 57 at Springfield, Idaho, this 11th day of Sept., 1933.

"(Seal)            (Sgd.)   M. G. LLOYD,
"(Chairman)
"(Sgd.)   DOROTHY HOUGHLAND,
"(Trustee)
"Attest:          (Sgd.)   ARTHUR J. SNYDER,
"(Clerk)

"The Notary Public of Springfield, Idaho hereby certified to the genuineness of the above signatures.

"(Seal)          (Sgd.)   THOMAS BLACKBURN,
"Notary Public Title."

January 15, 1934, defendant Diefendorf, as commissioner of public investments of the state of Idaho, made a certain application to the board of land commissioners of the state of Idaho, in the following words and figures, to wit:

"APPLICATION TO STATE BOARD OF LAND COMMISSIONERS. TO THE HONORABLE STATE BOARD OF LAND COMMISSIONERS OF THE STATE OF IDAHO: The Department of Public Investments of the State of Idaho, in pursuance of the provisions of Section 65–2901, I. C. A., as amended by Chapter 13, Extraordinary Session Laws of 1933, respectfully makes application for authorization to loan and invest a portion of the permanent educational funds of the State of Idaho, and in that connection submits the following data required by the statute aforesaid: 1. SECURITY IN WHICH INVESTMENT IS PROPOSED TO BE MADE: 1. Tax Anticipation Note, issued by School District No. 57, Bingham County, Idaho, a true copy of which is annexed hereto and made part hereof, the form, procedure for issuance of which and substance of which were approved by the opinion of the Attorney General of Idaho. 2. PERMANENT FUND IN WHICH INVEST-

MENT OR LOAN IS PROPOSED TO BE MADE: Public School Endowment Fund. 3. REASON FOR INVESTMENT: Uninvested, idle funds in the hands of this department may be profitably and safely invested by this department in the security aforesaid. 4. Price at which it is proposed to acquire such tax anticipation note: $1500.00, to bear interest at 6% per annum from date of purchase.

"DEPARTMENT OF PUBLIC INVESTMENTS.

"(Sgd)   BEN DIEFENDORF,

"Commissioner."

On the same day, January 15, 1934, that board approved the foregoing application in the following words and figures, to wit:

"MINUTE ENTRY, STATE BOARD OF LAND COMMISSIONERS. WHEREAS, the Department of Public Investments of the State of Idaho has heretofore made written application to this Board for permission and authorization under the provisions of Chapter 13, Extraordinary Session Laws of Idaho 1933 Session, to purchase as an investment of idle funds in the Public School Endowment Fund in the hands of the Department of Public Investments for investment one tax anticipation note of School District No. 57, Bingham County, Idaho, which application and copy of which note are annexed hereto for particularity, and WHEREAS, it appears to the satisfaction of this Board that such investment is a proper investment of such funds and that the authority requested should be granted and the said investment approved. IT IS ORDERED BY THE STATE BOARD OF LAND COMMISSIONERS that the said application of the Department of Public Investments annexed hereto be, and the same is hereby approved and allowed, and the investment aforesaid is hereby approved.

"Dated and entered this 15th day of January, 1934.

"(Sgd)   C. BEN ROSS   Chairman

"(Sgd)   HARRY C. PARSONS   Auditor

"(Sgd)   JOHN W. CONDIE.

"I dissent.

"FRANKLIN GIRARD

"Secretary of State."

January 29, 1934, plaintiff as Secretary of State of the state of Idaho, *ex-officio* a member of the state board of land commissioners, made an original application in this court, upon his affidavit of that date, for an alternative writ of prohibition, from which it appears that the defendant threatens to, and will, unless prohibited and restrained by the writ prayed for, invest public school endowment funds in said tax anticipation negotiable note. January 29, 1934, an order was entered directing that an alternative writ issue, and on that day an alternative writ of prohibition, in the usual form, issued, being directed to defendant as commissioner of public investments, commanding him to desist from taking any further steps to invest any of said funds in said tax anticipation negotiable note, · until the further order of the court. February 27, 1934, defendant made return to the alternative writ. April 21, 1934, counsel for the respective parties made and caused to be filed herein a written stipulation quite fully covering the jurisdictional, as well as the material, facts in the case.

In 1899, the legislature adopted a joint resolution which had for its object the submission to the electorate of the state, an amendment to section 11 of article 9 of the Constitution of the state of Idaho, the purpose of the proposed amendment being to authorize, under such regulations as the legislature might provide, the loaning of our permanent educational funds, other than funds arising from the disposition of university lands belonging to the state, on, among other, school district bonds, which proposed amendment was adopted at a general election held in November, 1900. The amendment is as follows:

"The permanent educational funds other than funds arising from the disposition of university lands belonging to the state, shall be loaned on first mortgage on improved farm lands within the state; state, United States, county, city, village or school district bonds, or state warrants, under such regulations as the legislature may provide: provided, that no loan shall be made on any amount of money exceeding one-third of the market value of the lands at the time of the loan, exclusive of buildings."

Section 65-2901, I. C. A., vested power in the department of public investments "to control, loan and invest all the permanent funds of the state in such securities as are designated in the state constitution," and while the legislature later amended (chap. 13, extra. Sess. Laws 1933) chapter 29, *supra,* by requiring said department to make an application to loan or invest such funds to and obtain the approval of the state board of land commissioners, said amendment also and only vests the department of public investments with power "to control, loan and invest all the permanent funds of the state in such securities as are designated in the state constitution."

Plaintiff contends that, assuming, but not conceding, that such amendment was proposed, submitted and adopted in accordance with the provisions of section 1, article 20 of the Constitution of the state of Idaho, the tax anticipation notes provided for by chapter 160, 1933 Session Laws, are not bonds within the meaning of the word "bond" as used in the above-quoted constitutional amendment. And plaintiff also contends that the provisions of said section 1, *supra,* are mandatory, and that said amendment was not proposed, submitted or adopted in accordance with the provisions of that section, and, consequently, that the amendment was not, in fact, made. Investment of such funds may be made only in the securities designated in the state Constitution (chapter 13, *supra*); therefore, if the tax anticipation notes provided for by chapter 160, *supra,* are not bonds within the meaning of the word "bond" as used in said constitutional amendment, then, of course, none of the permanent educational funds can be loaned on or invested in said tax anticipation negotiable note, and it will not be necessary to determine whether said constitutional amendment was, or was not, proposed, submitted and adopted as required by section 1, *supra.*

Chapter 160, *supra,* is very skilfully drawn, with the quite evident purpose of bringing tax anticipation notes within the meaning of the word "bond," as that word is used in the constitutional amendment. That statute was enacted some thirty-three years after the amendment was

adopted. Tax anticipation notes were unknown at the time the amendment was adopted. In what sense, then, was the word "bond" used? As used in the amendment, was it intended to mean all the notes and securities which the ingenuity of a legislature might devise and call a "bond," or only those instruments which possessed characteristics similar in general to school district bonds as were commonly known and defined to be such at the time of the adoption of the amendment? Judge Cooley forcefully states:

"A constitution is not to be made to mean one thing at one time and another at some subsequent time when the circumstances may have so changed as perhaps to make a different rule in the case seem desirable. A principal share of the benefit expected from written constitutions would be lost if the rules they establish were so flexible as to bend to circumstances or be modified by public opinion. It is with special reference to the varying moods of public opinion, and with a view to putting the fundamentals of government beyond their control, that these instruments are framed; and there can be no such steady and imperceptible change in their rules as inheres in the principles of the common law. Those beneficent maxims of the common law which guard person and property have grown and expanded until they mean vastly more to us than they did to our ancestors, and are more minute, particular and pervading in their protections; and we may confidently look forward in the future to still further modifications in the direction of improvement. Public sentiment and action effect such changes, and the courts recognize them; but a court or legislature which should allow a change in public sentiment to influence it in giving to a written constitution a construction not warranted by the intention of its founders, would be justly chargeable with reckless disregard of official oath and public duty; and if its course could become a precedent, these instruments would be of little avail. . . . . What a court is to do, therefore, is *to declare the law as written*, leaving it to the people themselves to make such changes as new circumstances may require. The meaning of the constitution is fixed when it is adopted, and it is

not different at any subsequent time when a court has occasion to pass upon it." (1 Cooley's Const. Lim., 8th ed., p. 124; *People v. Blodgett*, 13 Mich. 127, 138; *McPherson v. Secretary of State*, 92 Mich. 377, 52 N. W. 469, 31 Am. St. 587, 16 L. R. A. 475; *Scott v. Sandford*, 19 How. 393, 15 L. ed. 691.)

While the contention of the defendant is, broadly stated, that all tax anticipation notes, the issuance of which is provided for by chapter 160, *supra*, are "bonds," within the meaning of the constitutional amendment under consideration, the precise question presented here, is, as to whether the said tax anticipation negotiable note is a school district bond within the meaning of that amendment. The term "school district bonds," as used in the amendment denominating the securities in which our permanent educational funds may be invested, must necessarily have been understood, by the members of the legislature voting to adopt the said joint resolution, as well as by the electors voting to ratify the amendment, to mean those securities then generally known to be such. Some light is shed on the question as to how the term "school district bonds" was then generally known and understood, by the legislation authorizing the voting and issuance of school district bonds, enacted before and existing at the time, of the adoption of the amendment. We find that title 3, Political Code, chapter 10, Rev. Stats. 1887, authorized the issuance of school district bonds, upon a vote of two-thirds of the freeholders, for certain stated purposes, pledged the faith of each school district for the payment of both principal and interest of any and all bonds issued, and required that a sinking fund be provided for the redemption of the bonds at maturity. The chapter was re-enacted in 1899, and has since been amended, but still authorizes common school districts to vote and issue bonds.

And we further find that the organization of independent school districts throughout the territory was first provided for by title 3, Political Code, chapter 11, Rev. Stats. 1887, and that thereafter, the first session of the legislature of the state provided for the issuance of bonds by independent

school districts (Sess. Laws, 1890–1891), upon a vote of two-thirds of the qualified electors, and required that a sinking fund be provided for the redemption at maturity of any and all bonds issued. (The 1890–1891 statute was re-enacted in 1899, Sess. Laws 1899, p. 84.) All school district bonds were general obligations of the district.

So that for a number of years before, as well as at the date of, the adoption of the amendment, both common and independent school districts were authorized to, and many districts, no doubt, did, vote and issue bonds, which then and now differed in material respects from the anticipation bonds, or notes, under consideration here (chaps. 10 and 11, *supra*, and secs. 32–708, 32–709, I. C. A.). Common and independent district schools then trained and educated the children, as they now train and educate our children. For that reason people generally take a keen interest in any and all matters affecting schools, and particularly, a matter as important as voting school district bonds, because the property of the qualified electors of school districts was, and still is, taxed to pay the principal and interest of any bonds issued. It is thus emphasized and made clear, then, in fact, placed beyond serious controversy, that the term "school district bonds," was generally understood to mean by the public mind of that time, those securities the law then authorized school districts to issue upon a vote of two-thirds of the qualified electors of the issuing district, and requiring that a sinking fund be provided for the payment of the bonds at maturity.

This court held in *Parsons v. Diefendorf*, 53 Ida. 219, 23 Pac. (2d) 236, 238, that

"the fund (permanent educational) is unquestionably a sacred trust fund created for the express purpose of maintaining the public educational institutions of the state. Its history and purpose is set forth in *State v. Fitzpatrick*, *supra*, as follows (page 504 of 5 Ida., 51 Pac. 112, 113): 'Section 5 of the act of congress admitting Idaho as a state provides, *inter alia*, that all lands granted for educational purposes shall be disposed of only at public sale, and that the proceeds arising therefrom shall constitute a

permanent school fund, the interest of which only shall be expended in the support of the schools of that state. Section 12 of said admission act provides that said lands so granted shall be held, appropriated, and disposed of exclusively for the purpose therein mentioned, in such manner as the legislature of the state may provide. Said lands were accepted by the state on those conditions. The people have spoken on this subject in the constitution of the state. They declare, in section 3 of article 9 of the constitution, as follows: ''The public school fund of the state shall forever remain inviolate and intact. The interest thereon only shall be expended in the maintenance of the schools of the state . . . . No part of this . . . . fund, principal or interest, shall ever be transferred to any other fund, or used, or appropriated except as herein provided.'' ' ''

In *State v. Clausen*, 40 Wash. 95, 82 Pac. 187, the supreme court of the state of Washington had under consideration the question as to whether the permanent school funds of that state could be invested in certain waterworks bonds issued by the city of Port Townsend, and payable from the revenues to accrue from the operation of the water system. In that case it was contended that the waterworks bonds were true ''municipal bonds'' within the meaning of article 16, section 5, of the Constitution of that state, as amended in 1894, which provided that ''none of the permanent school funds of this state shall ever be loaned to private persons or corporations, but may be invested in national, state, county, municipal, or school district bonds.'' The Port Townsend waterworks securities were called ''bonds,'' just as tax anticipation negotiable notes are called ''bonds'' in chapter 160, *supra,* making the case substantially, if not exactly, analogous to the case at bar. The Washington court says:

''In the light of the care with which this fund has been nurtured and garnered, it would seem there was no escaping the conclusion that the framers and adopters of the constitution intended to define and fix irrevocably the character of the securities in which the fund might be invested. . . . . The words they used to define the securities in

which the fund might be invested, must therefore have had, in their minds, a fixed and definite meaning. By the terms 'national, state, county, municipal and school district bonds' they must have meant instruments which were then generally known to be such; instruments which the common mind then understood to be defined by those terms. . . . . The terms are descriptive as well as denominative.''

And the court further states quite forcefully that:

''Bonds of this character are of comparatively recent origin. At the time of the adoption of the constitution they were practically unknown. No text work on municipal securities then in existence contained a discussion of them, and but few, if any, courts had been called on to pass on their constitutionality. They are of the outgrowth of municipal exigencies. Hedged in as these corporations are by constitutional limitations as to the amount of indebtedness they can lawfully incur, they have been compelled, in order to procure some needed conveniences, to resort to pledges of the income to be derived. . . . . The fact alone that they were unknown at the time of the adoption of the constitution precludes the possibility of their having been included in any definition used in that instrument. . . . . The term, it seems to us, can admit of no other definition. Certainly it cannot have been so loosely used as to include every form of obligation that the ingenuity of the legislature might devise and call 'municipal bonds.' . . . . Indeed, if bonds of the character here described are municipal bonds, there can be no form of obligation, public or private, in which the legislature might not, by the legerdemain of making it a special municipal fund, lawfully authorize the investment of the permanent school fund. Such was not the intention of the constitution makers, and we cannot so hold.''

It is well settled that the legislature cannot, by definition, as attempted by chapter 160, *supra*, extend the meaning of words used in the Constitution to include meanings not within the intent of the framers of the Constitution. (*Perry v. Industrial Acc. Com.*, 180 Cal. 497, 181 Pac. 788; *South Carolina v. United States*, 199 U. S. 437, 26 Sup. Ct.

110, 50 L. ed. 261, 4 Ann. Cas. 737; *Cory v. Carter*, 48 Ind. 327, 17 Am. Rep. 738; *Ex parte Woods*, 52 Tex. Cr. Rep. 575, 108 S. W. 1171, 124 Am. St. 1107, 16 L. R. A., N. S., 450, 455; *Murphy v. Commonwealth*, 172 Mass. 264, 52 N. E. 505, 70 Am. St. 266, 43 L. R. A. 154; *Scott v. Sandford*, 19 How. 393, 15 L. ed. 691; 1 Cooley, Const. Lim., 8th ed., pp. 123, 124.)

It is contended by defendant that while section 3, article 8, of the Constitution of the state of Idaho prohibits the issuance of bonds, or any other obligation, by a taxing district, other than for ordinary expenses, in excess of the income and revenue for that year, without a vote of the people, that, nevertheless, taxing districts are absolutely free to issue tax anticipation notes, or "bonds," so long as such notes or "bonds," do not exceed the income and revenue for the year in which they are issued; and defendant contends "that we are here concerned only with the ordinary and necessary expenses of taxing districts for a current year and the power of a legislature to authorize taxing units to enter into obligations to raise money to meet those expenses by pledging the income and revenue for that year to their payment or the income from any future year, in the event there is a deficiency in the tax collections in the current year." And it is further argued by defendant that "there can be no difference between the two types of obligation," that is to say, between tax anticipation notes, or "bonds," and school district bonds, inasmuch as chapter 160, *supra*, provides that "such tax anticipation bonds or notes shall be negotiable instruments, and the full faith, credit and resources of the taxing district shall be pledged for the payment of the same," and because said chapter also requires that "there shall be created by the resolution providing for the issuance of said tax anticipation bonds or notes a special fund to be known as the 'Tax Anticipation Bond or Note Redemption Fund,' " and that "whenever any tax anticipation bonds or notes have been issued in anticipation of the collection of taxes, all such taxes thereafter collected or received, the collection of which has been so

anticipated, shall be placed in the 'Tax Anticipation Bond or Note Redemption Fund' until such time as the funds accumulated therein shall be sufficient to pay all such tax anticipation bonds or notes outstanding, together with interest thereon at maturity.''

To amend the Constitution something more than the ingenuity of a legislature is required. If all a legislature had to do, for example, to make tax anticipation notes, *bonds*, within the meaning of the constitutional amendment under consideration, was merely to enact a statute pledging the full faith, credit and resources of a taxing district to, and provide for the creation of a fund for, the redemption of the notes, then the securities which could be issued by taxing districts, with the legal standing of *bonds* within the meaning of the amendment, would be practically limitless, in which case, a ''sacred trust fund created for the express purpose of maintaining the public educational institutions of the state'' might suffer serious, irreparable losses.

Having reached the conclusion that tax anticipation notes are not *bonds* within the meaning of the said constitutional amendment, we do not deem it necessary to consider the question as to whether the amendment was, or was not, proposed, submitted and adopted as required by section 1, article 20, *supra*.

It follows from what has been said that a peremptory writ of prohibition must issue, and it is so ordered.

Budge, C. J., and Givens, Morgan and Wernette, JJ., concur.