STATE OF WEST VIRGINIA *v.* WILLIAM G. CONLEY *et al.*

(CC 574)

Submitted February 24, 1937. Decided April 3, 1937.

MAXWELL, JUDGE, dissenting.

*Clarence W. Meadows,* Attorney General, and *Ira J. Partlow,* Assistant Attorney General, for plaintiff.

*Lee, Blessing & Steed, Blue, Dayton & Campbell* and *T. C. Townsend,* for defendants.

FOX, JUDGE:

This case involves the personal and individual liability of the members of "The Board of the School Fund" for losses sustained by the plaintiff on account of a loan made by said Board to the Consolidated Fruit Company, a private corporation, on the 21st day of November, 1929. By reason of the nature of this controversy, involving as it does an interpretation of the constitution and statutes of the state, with respect to a matter of public importance, it is deemed appropriate, as a background for our decision, to give a brief history of the establishment and development of the fund, and the various constitutional and statutory provisions made with respect thereto, prior to the date of the loan.

Section 1, Article 10, Constitution of 1863, provides that all moneys accruing to the state from the proceeds

of forfeited, delinquent, waste and unappropriated lands and other sources of revenue therein particularly mentioned,

> "shall be set apart as a separate fund, to be called the School Fund, and invested under such regulations as may be prescribed by law, in the interest-bearing securities of the United States, or of this state: and the interest thereof shall be annually applied to the support of free schools throughout the state and to no other purpose whatever. But any portion of said interest remaining unexpended at the close of a fiscal year, shall be added to, and remain a part of, the capital of the School Fund."

Chapter 137, Acts of the Legislature, 1863, provides for the establishment of a system of free schools, and Section 53 of said chapter provides:

> "The governor, auditor, treasurer, secretary of state, and the general superintendent of free schools, shall be a corporation under the name of 'the board of the school fund,' and shall have the management, control and investment of said fund, under the first section of the tenth article of the constitution."

Section 58 provides:

> "The board shall from time to time invest all the uninvested capital and interest of the school fund in interest-bearing securities of the United States or of this state, as provided for in the constitution."

The general law governing free schools was amended by Chapter 74, Acts of 1866; also, by Chapters 66 and 98, of the Acts of 1867; and was embodied in Chapter 45 of the Code of 1868. No change was made by any of said enactments, or in the Code, from the sections of the statute above quoted, so that the law remained as it was until the adoption of the new constitution in 1872.

Section 4, Article 12, of the Constitution of 1872 provides that the existing permanent and invested school

fund and all money accruing to this state from forfeited, delinquent, waste and unappropriated lands, and from other sources specifically set out therein,

> "shall be set apart as a separate fund, to be called the 'School Fund,' and invested under such regulations as may be prescribed by law, in the interest-bearing securities of the United States, or of this State, or if such interest-bearing securities cannot be obtained, then the said 'School Fund' shall be invested in such other solvent interest-bearing securities as shall be approved by the Governor, Superintendent of Free Schools, Auditor and Treasurer, who are hereby constituted the 'Board of the School Fund', to manage the same, under such regulations as may be prescribed by law; and the interest thereof shall be annually applied to the support of free schools throughout the state, and to no other purpose whatever. But any portion of said interest remaining unexpended at the close of a fiscal year, shall be added to, and remain a part of, the capital of the 'School Fund:'."

This section of the constitution was amended by vote of the people in November, 1902; but the amendment only applies to the accumulation of the fund, and provides that such accumulation shall cease when the fund amounts to the sum of one million dollars, and that thereafter, the interest on said fund, and moneys accruing to the state required to be transferred thereto, shall be paid into the treasury to the credit of the general school fund, for the support of free schools.

After the adoption of the Constitution of 1872, the statutes were amended to conform thereto, and Section 69, Chapter 123, Acts 1872-73, provides:

> "The governor, state superintendent of free schools, auditor and treasurer shall be a corporation under the name of 'the board of the school fund,' and shall have the management, control and investment of said fund, under the fourth section of the twelfth article of the constitution."

Section 73 of said chapter, provides that:

"All such sums as have accrued, or shall hereafter accrue to this state, from the several sources enumerated in the fourth section of the twelfth article of the constitution, shall be set apart as a separate fund to be called 'The school fund', and it shall be the duty of the auditor to ascertain from time to time what sums have so accrued, or may hereafter accrue, and to pass the same to the credit of said fund; and it shall be the duty of the board of the school fund, from time to time, to invest the same in interest-bearing securities of the United States, or of this state, or otherwise, as provided for in said fourth section of the twelfth article of the constitution. And it shall be the duty of said board to sell any investments on account of the school fund now made in other securities than those required in said fourth section of the twelfth article of the constitution, and invest the proceeds thereof in the interest-bearing securities of the United States, or of this state, or otherwise, as provided in the constitution aforesaid."

The last provision of section 73 may be explained by the fact that Chapter 66, Acts 1867, and Chapter 6, Acts 1889, transfer to the school fund certain stocks in banks and improvement companies, at that time held by the state; and the provision of the statute, last above quoted, was evidently meant to require the sale of such securities and the investment of the proceeds thereof in the character of securities provided for in the constitution.

Chapter 15, Acts 1881, amends Section 69, above quoted, by adding thereto a provision that a majority of the board shall constitute a quorum to transact business; and Section 152 of Chapter 27, Acts 1908, amends Section 69, Chapter 123, of the Acts of 1872-73 by putting into effect the constitutional provision limiting the school fund to the sum of one million dollars. Aside from these changes, the statute remained in the form in which it was written in 1873, until changed by Section 195, Chapter 49, Acts of the Legislature, 1925. This act reads as follows:

"All such sums as have accrued to this state from the several sources enumerated in the

fourth section of the twelfth article of the constitution, not in excess of one million dollars, shall be set apart as a separate fund to be called 'the school fund' and the governor, state superintendent of free schools, auditor and treasurer shall be a corporation under the name of 'the board of the school fund', and shall have the management, control and investment of said fund, as provided by the fourth section of the twelfth article of the constitution. Said fund shall be invested in the interest bearing securities of the United States, or of this state, or of any county, city, town or village, or school district of this state, or if such interest bearing securities cannot be obtained, then said fund shall be invested in such other solvent interest bearing securities as shall be approved by such board. The governor shall be president of the board, and in his absence the board shall choose one of their number to preside temporarily in his place. The auditor shall be secretary of the board and custodian of the securities in which such fund is invested. A record shall be kept of all the proceedings and be signed by the president and secretary, and a copy thereof, certified by the secretary of the board shall be evidence in all cases in which the original would be. A majority of the board shall constitute a quorum for the transaction of business."

It was under this statute that the defendants made the loan in question in this proceeding, and their responsibility therefor must be tested by the constitution, and the act last above quoted.

On the 21st day of November, 1929, the Board of the School Fund, composed of William G. Conley, William C. Cook, William S. Johnson and Edgar C. Lawson, Governor, State Superintendent of Free Schools, Treasurer and Auditor, respectively, of the State of West Virginia, acting in their official capacity as members of the said board, entered upon the record thereof a resolution for the purchase of $75,000.00 of the bonds of the Consolidated Fruit Company, a private corporation, said bonds being in the denomination of $3750.00 each, dated the first day of September, 1929, the first bond pay-

able on the first day of March, 1930, and the remaining bonds to become due and payable on the first day of March of each year thereafter until all of them were paid, the interest thereon, at the rate of 6% per annum, to be paid semi-annually, on the first days of March and September of each year. The bonds were secured by a deed of trust, executed by the Consolidated Fruit Company, on certain real estate and other property situated in the cities of Williamson and Bluefield. The two bonds first falling due were paid, and interest on the entire issue was paid to the first day of September, 1931. Default in the payment of the bonds thereafter maturing occurred, and thereafter, the entire issue was, under the provisions of the deed of trust securing the same, declared to be due and payable. After this default a creditor of the Consolidated Fruit Company instituted a suit in the circuit court of Mingo County for the purpose of subjecting the property of said corporation to the payment of its debts, and in such proceeding a special receiver was appointed, the case referred to a commissioner, and ordinary procedure followed to ascertain and decree the debts of the corporation. The State of West Virginia, acting through its instrumentality, the Board of the School Fund, appeared in this suit, filed and had decreed to said board the amount of the said bonds with interest. The property on which the bonds were a lien was afterwards sold, purchased by said board, and the proceeds of such sale, after providing for costs of suit and expenses of sale, were applied as a credit on said decree, and there were also applied thereon small amounts paid by the special receiver who had the property in charge. After the application of all credits, the amount due the board as of the 31st day of July, 1935, was the sum of $58,917.66, and on that day, in the circuit court of Kanawha County, West Virginia, the said board obtained a judgment against the Consolidated Fruit Company for the sum of $58,917.66 with interest thereon from date of judgment, and costs of suit. Executions were issued on said judgment, and placed in the hands of the sheriffs of the counties of Mingo and

Mercer, which were returned "no property found". In order to protect the title of the property purchased by it, the board paid state and local property taxes to the amount of $1946.77, which amount the state contends should be added to the amount of the judgment aforesaid, as representing the loss suffered by her on account of the purchase of the bonds aforesaid.

This is a suit of trespass on the case in assumpsit, instituted in the circuit court of Kanawha County, returnable December Rules, 1935. The suit is brought in the name of the State of West Virginia against William G. Conley, William C. Cook, William S. Johnson and Edgar C. Lawson, individually. It is alleged in the declaration that the defendants occupied the positions of Governor, State Superintendent of Free Schools, Treasurer and Auditor, respectively, and were acting as such, in the month of November, 1929, and, by virtue of their positions, constituted the Board of the School Fund.

The first count of the declaration sets up the constitutional and statutory provisions respecting the investment of the school fund, and avers that it was the duty of the said board to invest such fund, either in the securities of the United States or of the State of West Virginia, or of any county, city, town or village, or school district of said state, subject only to the exception that if such securities could not be obtained, said fund might be invested in other solvent interest-bearing securities to be approved by such board; but alleged that, during all of the period when said defendants held office, and were members of said board, securities of the United States and of the State of West Virginia, and of the counties, cities, towns and villages and school districts therein, were readily and easily obtainable; that notwithstanding this fact, the said defendants, constituting said board, purchased the bonds of the Consolidated Fruit Company in the amount of $75,000.00 with the resulting loss to the state mentioned above; and avers that the amount of such loss was the sum of $58,917.66, with interest and costs, the amount of the judgment aforesaid in favor of

the Board of the School Fund, and the further sum of $1946.77, representing taxes paid.

The second count of the declaration contained the same allegations, with the additional charge that, immediately before the purchase of the bonds of the Consolidated Fruit Company, the available fund for investment in said school fund was approximately $8800.00; that on or about the 20th of November, 1929, the defendants, acting as the Board of the School Fund, sold school bonds of Slab Fork District, and road bonds of Barboursville District, local taxing units of the state, in the aggregate sum of $75,000.00 which, together with the sum on hands, created the fund out of which the Board, on the day following, entered the order for the purchase of the bonds of the Consolidated Fruit Company. An affidavit is attached to the declaration stating that the amount to which the plaintiff is entitled to recover, including principal and interest on all demands to the 27th of November, 1935, is the sum of $62,013.32.

The defendants filed their demurrer in writing to the declaration, assigning as grounds therefor, (1) that the action of trespass on the case in assumpsit was not the proper form of action upon the matters alleged therein; (2) that the matters set up in the declaration are not sufficient to establish, either expressly or by implication, any promise to pay money on the part of the defendants; (3) that the State of West Virginia was without right to maintain an action on the matters set up in the declaration, by reason of the fact that the cause of action, if any existed, was an action which only the Board of the School Fund could maintain; (4) that the defendants had the right, when acting in good faith, to make the loan to the Consolidated Fruit Company, complained of; (5) that the defendants had discretionary power to make the said loan; (6) that the plaintiff ratified the action in making such loan, by adopting such action as her own, and proving the amount of the same in the chancery cause in which the property of the Consolidated Fruit Company was decreed and sold; and (7) that it does not appear, from the declaration, that plaintiff had suffered

any loss, inasmuch as she purchased the real estate securing the said bonds, and there is no allegation that the value of the said real estate is insufficient to cover the amount of the plaintiff's claim.

The defendants also filed their special plea No. 1, setting up, (1) that in making the loan complained of, they acted in good faith, under what they believed to be an exercise of their authority and discretion, under the pertinent provisions of the constitution and statutes, as the same had been interpreted, construed and applied by their predecessors in office; (2) that before making said loan, they caused investigation to be made as to the value of the property securing the same, and believed that the said investment was a safe one; (3) that they acted under advice of the duly elected and qualified attorney general of the state, their legal advisor in such matters, who advised them that they had the legal right, authority and discretion, when acting in good faith, to invest the school fund in securities of solvent individuals and corporations, even though public securities could then be obtained, should the board believe that the interests of the school fund would be furthered by the purchase of securities of solvent private corporations or individuals, by reason of a greater yield or return therefrom; (4) that at the time of making said loan, defendants were advised that, through long, continuous and accepted interpretation of the constitution and statutes involved, the right to make investments in solvent private securities was vested in the defendants, acting as such board; (5) that their predecessors in office, over a long period of years, had followed the practice of investing said school fund in securities of solvent private corporations and individuals, and they incorporate in this section of their plea a statement, showing the investment of large sums of money, belonging to said fund, in securities of individuals and private corporations; (6) that the said loan to the Consolidated Fruit Company was made, because of the aforesaid long established interpretations and construction by their predecessors in office, of the constitution and statutes aforesaid, and the opinion of

the Attorney General of the State of West Virginia, and because the defendants believed that such investment would further the interests of the school fund by reason of the larger yield or return which could be obtained therefrom; and (7) that the real estate upon which the said loan was made, and which is now owned by the plaintiff, is of a value greater than the amount of the plaintiff's claim; and that if the same is properly handled, managed and disposed of, it will bring a sufficient sum to fully satisfy the amount claimed by the plaintiff from the defendants.

The plaintiff demurred to the defendants' special plea No. 1 on the grounds, (1) that the good faith of the defendants in making said loan does not constitute a defense to the action; (2) that their belief that the making of the said loan was advisable, and to the interests of the school fund, at a time when public securities were available, was not a defense to the action; (3) that the advice of the attorney general did not excuse or justify such loan; (4) that the interpretation and construction of the constitution and statutes by their predecessors in office did not excuse or justify the loan; (5) that the action of their predecessors in office in making investments of the school fund in securities of private corporations and individuals, at a time when public securities were obtainable, did not excuse or justify the act of the defendants in so doing; (6) that it was the duty of the defendants to obey the constitutional and statutory provision, relating to the investment of the said school fund, and that the investment thereof in bonds of the Consolidated Fruit Company, at a time when interest-bearing public securities, such as defined in the constitution and statutes, were obtainable, and the fact that defendants may have accepted a long established interpretation and construction by their predecessors in office, and may have acted on advice of the attorney general, or may at the time have believed that the investment was in furtherance of the school fund because of the larger yield did not excuse or justify the said loan; and (7) that the plaintiff, through its instrumentality, the Board of the

School Fund, having purchased, at a judicial sale, property conveyed to secure the payment of said loan, and having credited the loan with the proceeds of such sale, the complete title to said property is now in the plaintiff, through its said instrumentality, and the defendants have no right to the benefit of the profit, if any, that may be realized from the sale or disposition of the property, nor will the defendants be subjected to further liability should the property be sold at a price less than that paid therefor.

The case was submitted upon the pleadings above outlined. The court below overruled the demurrer to the declaration, and also overruled the demurrer of the plaintiff to defendants' special plea No. 1. The opinion of the court is made a part of the record. The only question covered by the opinion of the court below involves that of the discretion vested in the defendants as members of the Board of the School Fund, and it was held that the proper construction of the phrase "cannot be obtained", when applied to the inability to obtain public securities for investment, is that such public securities "cannot prudently be obtained". The court, in his opinion, says:

> "The demurrer to the declaration might properly be sustained, but inasmuch as the special plea contains affirmative allegations tending to show good faith in making the investment, the demurrer to the declaration is overruled and the case is disposed of on its merits, as they appear in the pleadings by overruling the demurrer to the special plea."

This action of the court is, on joint application of the parties, certified to this court for decision on all of the points raised by the declaration, the demurrer thereto, defendants' special plea No. 1, and plaintiff's demurrer thereto.

Defendants say that they cannot be sued in action of trespass on the case in assumpsit upon the matters set up in the declaration, they having been, at the time of the acts therein alleged, public officials of the state and their acts being those of such officials. It is not clear just what

is meant by this contention. We assume it is meant to confine it to the point of whether or not the action of assumpsit is the proper remedy on the facts alleged. While it is true that a public official, exercising the duty of his office, within the powers and discretion vested in him as such, cannot be held liable for his acts, this salutary rule cannot be extended to permit such official to escape liability for acts entirely without and beyond the powers conferred on him in his public capacity. Beyond the limit of his power, a public official is amenable to the law the same as a private individual. 12 R. C. L. 1001. In the following cases, suits have been maintained against public officials, growing out of alleged liability on account of improper investment of public funds: *Board of Trustees* v. *Baker*, 34 Ill. App. 620; *Lindsey* v. *Marshall*, 12 Smede's & Marshall's Rep. (Miss.) 587; *Board of Trustees* v. *Baker*, 24 Ill. App. 231; *People* v. *Mitchell*, 223 Ill. App. 8; *Industrial Commission* v. *Strong*, 77 Colo. 590, 239 P. 112; *Warren* v. *Commonwealth*, 136 Va. 573, 118 S. E. 125; *Amy* v. *Supervisors*, 11 Wallace 136, 20 L. Ed. 101. In none of these cases, so far as we have been able to discover, was the right to hold such officials responsible, in a proper case, questioned.

The defendants cite the cases of *McMillan* v. *Eastman*, 4 Mass. 378, and *Bailey* v. *Butterfield*, 14 Maine 112, and certain text law based thereon, in support of their contention that the action of assumpsit cannot be maintained on the matters set up in the declaration herein. The Maine case, decided in 1836, followed the Massachusetts case, decided in 1821, and the setting, as to both of said cases, is different from the case at bar. In the Massachusetts case, the claim for damages grew out of the failure of an official to execute a deed, from which failure, it was alleged, damages to the plaintiff resulted. No question of accounting for money, or a fund, was involved. The opinion, referring to the defendant, states:

> "He received the money in trust for the United States in due course of his official duty, and to them he either has accounted, or must account."

In the Maine case, a local statutory proceeding on an official bond was involved. These cases were decided more than a century ago, and while age should not lessen the force of a sound principle, we must not close our eyes to the fact that during the past one hundred years the scope and use of the action of assumpsit has been widely expanded.

> "The action of assumpsit is a liberal and equitable one. It is applicable to almost every case where money has been received which in equity and good conscience ought to be refunded."

*Thompson* v. *Thompson,* 5 W. Va. 190; *Jackson* v. *Hough,* 38 W. Va. 236, 18 S. E. 575; *Hughes* v. *Frum,* 41 W. Va. 445, 23 S. E. 604.

> "An action of assumpsit lies upon a promise made or a promise implied by law as a legal inference from a given state of facts."

*Morgantown Bank* v. *Foster,* 35 W. Va. 357, 13 S. E. 996, 997.

> "It does not make any difference whether the defendant ever made any such promise, nor is it necessary to prove it. All that is necessary to prove is a liability under the allegations of the declaration and the law implies the promise if it is properly alleged."

*Waid* v. *Dixon,* 55 W. Va. 191, 46 S. E. 918, 920.

> "Whenever the circumstances create a legal liability the law implies a promise upon which an action of assumpsit will lie."

5 C. J. 1385. Discussing the action of assumpsit, it is stated in 2 Ruling Case Law, 743, that:

> "In theory it was an action to recover for the nonperformance of simple contracts, and

the formula and proceedings were constructed and carried on accordingly. Very early, however, there were successful efforts to apply it beyond its import, and from the reign of Elizabeth this action has been extended to almost every case where an obligation arises from natural reason, and the just construction of law, that is, *quasi ex contractu;* and it is now maintained in many cases which its principles do not comprehend and where fictions and intendments are resorted to, to fit the actual cause of action to the theory of the remedy. It is thus sanctioned where there has been no actual assumpsit, no real contract, but where some duty is deemed sufficient to justify the court in imputing a promise to perform it, and hence in bending the transaction to the form of action."

Code 1923, Chapter 99, Section 16a:

"An action of trespass on the case in assumpsit may be brought in all cases to recover damages for the breach of any contract sealed or unsealed, express or implied."

Code 1931, 55-8-3:

"An action of assumpsit shall lie in all cases to recover damages for the breach of any contract, express or implied, and, if in writing, whether under seal or not."

The provisions of our statute which allow use of the action of assumpsit on any note or writing, whether sealed or not, thus allowing its use in cases where only debt or covenant might have been used, illustrate the modern tendency in this state to liberalize the use of this action, and it serves to cover cases where, under former rulings, resort to equity might have been required. To a certain degree, it bridges the chasm between technical actions such as debt and covenant and actions which are only cognizable in courts of equity, and encroaches somewhat upon the field of both.

Applying these authorities to the case before us, we

think it fair to say that the defendants, occupying their respective positions, and having qualified as such, entered into a covenant or undertaking with the public to perform certain duties appertaining thereto, in accordance with the constitution and statutes of the state; among their duties were those assigned to the Board of the School Fund, of which they constituted the full membership; to this board was entrusted the "management, control and investment" of the school fund created and controlled by constitutional and statutory provisions; they received this fund from their predecessors in office, and in contemplation of law, undertook and promised to manage, control and invest and account for the same as the law directed. It is alleged that they failed to perform this duty, in that they invested said fund, contrary to law, in securities from which loss to the state resulted, and did not keep the promise they made to properly and lawfully manage, control and invest said fund. We think these allegations, if established as true, create a situation from which a promise to restore to the fund the moneys wrongfully lost, can be implied, and that it furnishes a legal basis for this action of assumpsit.

The next contention of the defendants is that, even admitting that an action of assumpsit can be maintained, and that the matters set up in the declaration, if proven, justify recovery, the state is not a proper plaintiff; they say that a suit, if maintainable, can only be prosecuted by the Board of the School Fund, a corporation created by the constitution and statutes to manage, control and invest the school fund. With this proposition we cannot agree. The school fund is made up of money accruing to the state; the money belongs to the state; the Board of the School Fund is a mere instrumentality of the state, and while a suit, on the demand set up herein, might properly have been maintained in its name, the right of the state to sue is not thereby precluded. *Knox County* v. *Hunnolt*, 110 Mo. 67, 19 S. W. 628; *Cole County* v. *Dallmeyer*, 101 Mo. 57, 13 S. W. 687. The action was therefore properly instituted in the name of the state.

This brings us to a consideration of the responsibility

of the defendants for the alleged loss to the state on account of the loan made by them, in their official capacity as members of the Board of the School Fund, to the Consolidated Fruit Company. In approaching this question, we shall base our discussion on the premise that the board had money to invest, although in connection with the exercise and discretion, the circumstances of this particular loan may call for comment. The terms of the constitution, and the statutes enacted thereunder should be interpreted and construed, generally speaking, with relation to their applicability to a case where the board has money for which it seeks investment.

The allegations in the declaration that, at the time the loan to the Consolidated Fruit Company was made, securities of the United States, the State of West Virginia, and the counties, cities, towns, villages and school districts of the state, were readily and easily obtainable, is admitted for the purposes of the demurrer and is not denied in the plea of the defendants. We must, therefore, treat these allegations as true. Being true, what was the duty of the board? The constitution says, in effect, that the school fund shall be invested in the securities of the United States and this state, if they can be obtained. Chapter 49, Acts of the Legislature, 1929, attempted to broaden the constitution by authorizing such investment in securities of any county, city, town, village or school district of the state, and the question of its authority to do so is not here involved. It must be apparent, however, that the framers of the constitution and every legislature, which has dealt with the subject, and as late as the year 1925, has intended that the school fund should be invested in public securities; and that only when they could not be obtained, would an investment in any other type of securities be justified. The language of the constitution and statutes is plain. Where the language used is clear and unambiguous, courts must be governed thereby, and should never attempt to read into a constitutional or statutory provision a meaning which was not intended.

"There is no safer or better settled canon of interpretation than that when language is clear and unambiguous, it must be held to mean what it plainly expresses."

Lewis' Sutherland Stat. Const., section 367; *Blumberg* v. *Snyder*, 90 W. Va. 145, 110 S. E. 544. Giving to the language of the constitution, and the statutes enacted thereunder, the plain and ordinary meaning which should be applied thereto, we do not doubt that the terms of both the constitution and statutes were violated when, public securities being obtainable, the defendants purchased the bonds of the Consolidated Fruit Company.

The duties of the members of the Board of the School Fund were ministerial and not judicial. *City of Newport* v. *McLane*, 256 Ky. 803, 77 S. W. (2d) 27, 96 A. L. R. 655. The prescribed duties of the board, with respect to the investment of the school fund, were definite and precise. True, discretion was necessarily vested in the Board as to the purchase of securities in the prescribed classes. For example, as to whether the securities of the United States or of this state or of any of its subdivisions should be purchased; or, if such securities could not be obtained, then as to which of such other securities presented for sale should be purchased; but such discretion as to administration, clearly within the powers granted to the board, cannot reasonably be expanded to create a discretion, bearing on the grant of the power itself, where the language used imports no intent to vest such discretion as to the principal power. The discretion permissible in the selection and purchase of a security which the board had a right to purchase, must not be confused with the case where a discretion was not intended to exist. The board had no right to purchase private securities when public securities were obtainable. On that point, there is no discretion. Such discretion as may have been given to the board, within the powers granted, fails to take its members out of the class of officials performing ministerial duties in connection with their relation to the school fund, and their duties being ministerial, they are liable for acts performed in viola-

tion of the powers vested in them. *Henderson* v. *Smith,* 26 W. Va. 829, 53 Am. Rep. 139; *Clark* v. *Kelly,* 101 W. Va. 650, 133 S. E. 365, 46 A. L. R. 799; *Amy* v. *Supervisors, supra.* There is no lack of authority on the question. Principles governing cases of this character we find well stated in 56 C. J. 192:

> "Where an officer or agent of the state who is charged by law with the administration of the school fund administers it in accordance with such law, he cannot be called into account for so doing and is not personally liable for any loss or diversion of the fund which may result; but a loan of school funds upon other security than that required by law is a misapplication of such funds for which the officer making the loan is personally liable and one whose duty it is to investigate the value of, and title to, property offered as security for such a loan is liable for damages resulting to such fund from his negligence."

The following authorities deal with cases where questions have arisen or losses have resulted from violations of constitutions and statutes with respect to the investment of public funds. *Board of Trustees* v. *Baker,* 24 Ill. App. 231, and 34 Ill. App. 620; *Lindsey* v. *Marshall, supra; State* v. *Fitzpatrick,* 5 Idaho 499, 51 P. 112; *State ex rel. Hellar* v. *Young,* 21 Wash. 391, 58 P. 220; *State ex rel. Townsend* v. *Clausen,* 82 P. 187; *Industrial Commission* v. *Strong, supra; Parsons* v. *Diefendorf,* 53 Idaho 219, 23 P. (2d) 236; *Girard* v. *Diefendorf,* 54 Idaho 467, 34 P. (2d) 48; *Wiley* v. *Sparta,* 154 Ga. 1, 114 S. E. 45, 25 A. L. R. 1342; *People* v. *Mitchell, supra.*

The defendants, in point four of their demurrer to the declaration, say that, under the constitution and statutes, properly interpreted and construed, they had discretionary power, when acting in good faith, to make the loan herein involved; and in point five of said demurrer, they say that under such constitution and statutes, they had discretionary power to invest the money of the school fund in interest-bearing securities other than securities

of the United States, the State of West Virginia, and its subdivisions. In point four, they limit their contention by the requirement of good faith, while in point five, they assert their power to be unconditional. We are unable to agree with either contention. We would limit the discretion which may be exercised to the selection and purchase of securities such as they were legally authorized to purchase, and would deny that they have any discretion to purchase private securities when public securities were obtainable. If, when the securities of the Consolidated Fruit Company were purchased, securities of the United States, State of West Virginia, or of any county, city, town, village or school district were obtainable, the legal right of the board to purchase such private securities did not exist, and by the use of no discretionary power could that right be brought into being.

The question of good faith is not here involved. The exercise of the utmost good faith cannot serve to create a power not granted by the constitution. The alleged fact that the defendants, in making the loan to the Consolidated Fruit Company, acted in good faith, under what they believed to be their authority and discretion under the constitution and statutes as interpreted, construed and applied by their predecessors in office, over a long term of years, does not serve to create the asserted power and discretion unless grounds for such interpretation of their powers be found in the constitution itself. If it were otherwise, constitutional provisions would find their interpretation in the understanding and good intent of those acting thereunder. Nor does the alleged fact that, prior to the making of said loan, the defendants secured an appraisal of the property offered as security therefor, and believed the securities purchased by them to be solvent, and the investment a safe one, save them from legal responsibility for losses incurred in making an investment which they had no right to make; nor does the alleged fact that the defendants, or their predecessors in office were advised by the attorney general of the state that they had the right to make such investment in private securities, when acting in good faith,

even though public securities were available, when they believed the same would be in the interest of the school fund and would yield a greater return, save them from the result of their plain violation of the constitution and statutes from which they derived their power to manage, control and invest said fund. *In People* v. *Mitchell, supra,* it was held:

> "The fact that the attorney general was consulted and advised that the investment of school funds in certain notes secured by a trust deed was within the statutory requirement that such funds be invested in certain specified securities or in good first mortgages, will not protect the state treasurer from liability, for the investment is in fact a violation of a plain, unambiguous requirement of the statute."

And in *Leddy* v. *Cornwell,* 52 Colo. 189, 120 P. 153, 38 L. R. A. (N. S.) 918, Ann. Cas. 1913 C, page 1304, it was held:

> "While the construction placed upon a statute in opinion of the attorney-general is persuasive authority, it is neither conclusive nor binding upon the courts, and where it is without authoritative legal support it should not be approved or followed."

See also 2 R. L. C. 920.

Much stress is laid on the allegations of the special plea, setting up the claim that by reason of a long, continuous and accepted interpretation and construction of the provisions of the constitution and statutes by the defendants' predecessors in office, they had the right to make investments in private securities, even where public securities were obtainable, when the yield or return from such private securities would be greater than that which could be secured from public securities; and also, setting out *in extenso* the securities in which the school fund had been invested over a long period of time, and including many private securities. These allegations do nothing

more than attempt to create a power and discretion not warranted by the constitution or by any statute enacted thereunder. Neither interpretation, construction nor custom can create power not authorized by the instrument being interpreted or construed. Contemporary interpretation and construction frequently have weight when the instrument involved is ambiguous in its terms, but they have no place where the meaning of the instrument is made clear by the language used.

But, say the defendants, the provisions of the constitution, adopted in 1872, which permit the purchase of private securities when it was known that public securities, particularly those of the United States, were then in existence and were obtainable, and would probably continue to be, argues that some discretion, as to the purchase of private securities, even where public securities were obtainable, was intended. Otherwise, they say, the language as to private securities would not have been used. The answer is that to yield to this contention would be to destroy the paramount intent of the constitution, which was to require the investment of the school fund in public securities, where possible, and certainly no one will contend that the men who framed the constitution or the voters who ratified it ever had any such purpose in mind. Public securities were undoubtedly preferred, and yet, the contention of the defendants, carried to its logical conclusion, would permit the Board of the School Fund to sell all public securities now owned by it, and invest the fund in private securities, provided the change would result in a greater yield or return. Giving to the constitution this construction, the court below would amend the same by inserting the word "prudently" when used in connection with the words "cannot be obtained." In truth, in this case, public securities, bearing a fair rate of interest, were sold and the proceeds used to make the loan to the Consolidated Fruit Company. This is mentioned merely to show the danger lurking in the doctrine of discretion contended for by the defendants. If we are called upon to make a decision which will make meaningless either of the provisions of the constitution

governing the investment of this fund, we prefer to give life and vigor to that provision which more nearly provides for the safety of the fund, and guards against the result of fluctuating values of private property so vividly noticeable in recent years.

This case involves public funds, but we may find it useful to consider the attitude of courts with respect to investments of private funds made by fiduciaries and others occupying positions of trust. It is safe to say that in no branch of the law are more rigid rules applied and enforced than those respecting such investments. Is there any good reason why these rigid rules, which do so much to assure the safety of trust funds, shall not also be applied when public funds are at stake? One of the reasons advanced for the discretion contended for by the defendants in this case is the greater yield which can be obtained from the investments in private securities. That was the contention of the defendant in *Whitehead* v. *Whitehead*, 85 Va. 870, 9 S. E. 10, but the court held that he was liable for losses sustained on account of his violation of an order of the court giving direction as to investments. In that case, there was an order of the court; here, we have a constitution; there would seem to be no difference in principles between the two.

"A public office is a public trust, and public property and public money in the hands of or under the control of a public officer constitutes a trust fund for which the official as trustee is responsible to the same degree as the trustee of a private trust fund."

*Crane* v. *Secoy*, 103 Ohio St. 258, 132 N. E. 851, 18 A. L. R. 979.

The defendants strongly rely on acts of their predecessors in office, who, they say, acting on the advice of the attorney general, established the usage or custom of making investments of the school fund in private securities, and over a long term of years; they contend that the interpretation and construction of the constitution

and statutes, adopted by their predecessors in office, and followed by such investments, furnishes an excuse for their own conduct in making the loan here under attack. The opinion of Judge Brannon, in the case of *State* v. *Chilton*, 49 W. Va. 453, 39 S. E. 612, 614, which we quote below, furnishes the answer to this contention:

"Infinite authority exists for the law proposition that the powers and duties of all governmental officers 'are limited and defined by law,' by statute where one exists as in this case. It is the sole criterion of authority, and no custom can enlarge or vitiate it. The Floyd Acceptances, 7 Wall. 666. This usage theory was assigned in the case just cited, to bind the government to commercial paper accepted by the Secretary of War, as it had been the custom for the secretary to make such acceptances; but the court repudiated the doctrine upon the fixed principle that such custom could not prevail against law. The court said that such unauthorized acts by an officer, however frequent, could not stand as a foundation for the authority assumed. Such a practice (I will not call it custom or usage) such a personal practice of individual secretaries, cannot be upheld by this Court, because contrary to the plain import of the statute, and calculated to encourage loose official practice entailing loss on the State. There is no need or justification for it. Another reason against the recognition of this practice is, that to be good, even as to an individual principal, it must be brought home to the knowledge of that principal. *Johnson* v. *Burns*, 39 W. Va. 658. How will you bring it home to the State? To what officer? To the Governor or Auditor, *surely not*? To the secretary himself? A public officer cannot ratify expressly his own unauthorized act, and surely cannot do so by such mere implication. *State* v. *Hays*, 52 Mo. 578; *Delafield* v. *State*, 26 Wend. 192. Having no power to make credit sales, by his own knowledge that he did make them, neither he nor his predecessors could by that knowledge ratify the acts to protect themselves against the State demands. Estoppels do not generally bind a State, that is estoppel by conduct of its officers.

'Clearly the State cannot be estopped by unauthorized acts of its officers.' Bigelow on Estoppel, 341; *U. S.* v. *Kirkpatrick*, 9 Wheaton 735. This is even as to third parties and more so as to officers themselves."

The defendants, in their demurrer, say that the plaintiff ratified their action in making the loan to the Consolidated Fruit Company, by adopting such action as their own, and thereafter proving said loan and the deed of trust securing the same. The act of the plaintiff, through her instrumentality, the Board of the School Fund, in proving the loan, and to that extent, lessening the liability to the defendants, and therefore for their benefit, did not operate to ratify the former act of the defendants, even if the power to do so was vested in the board. If the act of the board was illegal in the first instance, the ratification of such illegal act by the same board or by its successor would likewise be illegal. Two illegal acts do not create a right, any more than one such act. It was the duty of the plaintiff to minimize the loss, and it is not difficult to imagine the force and fervor of the complaint which would have been made had the state failed to prove the loan and saved the benefit of the lien securing the same.

The fact that the Board of the School Fund became the purchaser of the property conveyed to secure the loan, gives the defendants no right to call upon the plaintiff for any accounting for any sum which may thereafter be obtained from a sale of said property. The property was sold under the decree of a court of competent jurisdiction and such sale was approved by said court. The fairness of the sale has not been questioned. The right of the parties to this action, with respect to said property, was settled by the judicial sale thereof.

The conclusions we have reached in this case seem to be called for by every consideration of sound public policy. The school fund here involved, dating as it does from the founding of this state, and referred to in the first constitution, has been the constant care of the public. The fund still exists, and in its rebuilding, needs,

not only the anxious care of the executive and legislative branches of the government, but the protection of the courts as well. Furthermore, in the management, control and investment of this fund, those in charge need to know that they are bound by certain limitations of power "whose fatal circumference they cannot pass" without assuming personal responsibility for their acts. Thus, will the mistakes of the past be avoided in the future, and it is hoped, good result to the State from the principles herein announced.

It follows that the action of the circuit court in overruling the demurrer to the declaration of the plaintiff is affirmed; the action of said court in overruling the demurrer of the plaintiff to the special plea of the defendant is reversed; and this action is remanded for further proceeding not in conflict with this decision.

*Affirmed in part; reversed in part; remanded.*

MAXWELL, JUDGE, dissenting:

Being unable to subscribe to the court's holding that the defendants' special plea does not present adequate defense to the action, I respectfully dissent.

The state seeks to recover from the members of the Board of the School Fund, in office in 1929, the sum of $58,917.66, balance due the State on an investment of $75,000.00, made by the board that year in bonds of a commercial corporation.

The state does not charge defendants with bad faith or corruption. There is no allegation that any of the defendants profited in the slightest degree from the investment.

By their special plea, the defendants say that in good faith, in furtherance of the discretion reposed in them by law in the exercise of their official duties, and in pursuance of a long established interpretation of the pertinent provisions of the law, they invested the sum of $75,000.00 in first mortgage bonds of the Consolidated Fruit Company, a corporation, whose real estate, bound

by the mortgage, was fairly appraised at $225,000.00, at the time the loan was made.

Of course, the board did not then know that just ahead there was a terrible economic depression that would emasculate the values of real estate throughout the country, including the properties which had been mortgaged to secure the bonds herein considered.

In my opinion, the circuit court was right in holding that the allegations of said plea, if sustained by proof, would constitute full defense to the action.

It is settled law that, though a public officer clothed only with ministerial authority may be forced to respond in damages because of misfeasance or malfeasance in the administration of his office, an official whose functions are judicial or *quasi* judicial cannot be called on to respond in damages for the honest employment of his judgment, however erroneous it may have been. "One serving in a judicial or other capacity in which he is required to exercise a judgment of his own, is not punishable for a mere error therein, or for a mistake of the law. His act, to be cognizable criminally, or even civilly, must be willful and corrupt." 1 Bishop's New Criminal Law (8th Ed.), section 460. Of like import: Mechem's Public Offices and Officers, section 638; *Warren* v. *Commonwealth*, 136 Va. 573, 118 S. E. 125; *Salt Lake County* v. *Clinton*, 39 Utah 462, 117 P. 1075; *Roerig* v. *Houghton*, 144 Minn. 231, 175 N. W. 542; *Comanche County* v. *Burks*, (Tex. Civ. App.) 166 S. W. 470; *Guillot* v. *State Highway Comm.*, (Mont.) 56 P. (2d) 1072.

Official conduct is termed *quasi* judicial when, being less than fully judicial, it nevertheless involves discretion. *Goff* v. *Wilson*, 32 W. Va. 393, 402, 9 S. E. 26, 3 L. R. A. 58. In the discharge of *quasi* judicial duties, an official must exercise judgment and is not called on to follow a fixed routine.

Were the defendants at bar, in the exercise of their duties as members of the Board of the School Fund, clothed with the discretion of determining whether school funds under their care should be in public securities or

otherwise? Or were they confined by the letter of the law to investment in public securities only? In my judgment, the law clothed them with authority to exercise discretion respecting the nature of the investments. My reasons for this conclusion are here presented.

Section 4, Article XII of the State Constitution provides that funds in the control of the Board of the School Fund shall be invested "in the interest-bearing securities of the United States, or this State, or if such interest-bearing securities cannot be obtained, then said 'School Fund' shall be invested in such other solvent, interest-bearing securities as shall be approved" by the board. At the time that provision was written, this State had not issued any securities, and whether there would ever be any was a matter necessarily beyond the ken of the framers of the constitution. But, when the document was written, interest-bearing securities of the United States were in existence and could be obtained for investment purposes. Also, the makers of the constitution and the people who ratified it, cognizant of the ways of national governments of the world respecting the issuance of securities, cannot be deemed to have closed their eyes to such generally known facts. They must be considered to have anticipated when the constitution was written, and later adopted, that probably there never would be a time when interest-bearing securities of the United States government would not be available for the investment of funds in the custody of the Board of the School Fund. On that background, the requirement that the school funds should not be invested in other solvent securities unless interest-bearing securities of the United States "cannot be obtained" is a vain and useless inhibition, unless the provision was intended to involve some degree of discretion on the part of the board in charge of the funds. The fact is that at all times since the framing of the present state constitution, United States securities have been available for investment. What significance, then, can be given to the provision "if such interest-bearing securities cannot be obtained?" We must presume that some practical meaning was intended to be attached

thereto. In my opinion, an enigma is avoided and the language made entirely intelligible if the phrase "cannot be obtained" be interpreted to mean *cannot be obtained on a basis satisfactory to the board,* or, as the circuit court phrased it, *cannot be prudently obtained.* The framers of the constitution, knowing that governmental securities might at times be procurable only at impracticable or prohibitive prices, may reasonably have considered that in those circumstances such securities could not be obtained on a basis satisfactory for investment of school funds, and therefore, the board would deem it better business to invest in commercial securities.

Another approach. It is to be presumed that public officials act in good faith. Where, in good faith, they have placed an interpretation on the law and acted accordingly, their actions should not be proscribed unless they were manifestly wrong. "The construction, given to a statute by those charged with the duty of executing it, ought not to be overruled without cogent reasons." *Daniel* v. *Simms,* 49 W. Va. 554, 39 S. E. 690, 695. From the special plea of the defendants, it appears that under several state administrations prior to the Conley administration, the Board of the School Fund had interpreted the pertinent constitutional provision and the sustaining statute as authorizing the board to make investments in commercial securities when the board deemed such investments preferable to the purchase of governmental securities. Such practice, of course, did not have the effect of making law, but it afforded substantial background of practical interpretation of the law. This interpretation should not be cast aside unless it is indefensible.

Thus, in my opinion, the constitutional provision should be held to place reasonable discretion in the Board of the School Fund to determine in good faith when commercial securities would afford more satisfactory investment than governmental securities. Discretion thus being reposed in the members of the board, their action in pursuance thereof is *quasi* judicial, and they are not personally responsible for a mistake of judgment. Of

course, public securities are to be preferred and should receive the primary consideration of the board.

So far as bears on the question now before us I am impressed that, respecting the funds invested, we are concerned only with the fact of the investment and not with the source from which the funds were derived, whether from investments matured or securities sold. In the instant case the bonds purchased paid a higher interest rate than could be obtained from federal or state securities.

Complementary to the principles herein discussed is a matter of serious portent, in the light of the rigidity of construction which the court has applied in the decision of this case. The constitutional provision under discussion provides for the investment of school funds in securities of the United States or of this State. The statutes, in purported exemplification of the constitutional provision, have provided for investments not only in securities of the United States or of this State, but, as well, in securities of any county, city, town or village, or school district of this State. Acts of the Legislature of 1925, Chapter 49; Code 1931, 18-9-5. Suppose an investment of school funds in bonds of a county, city, town, village or school district should result badly? An unconstitutional statute affords no protection to public officials relying thereon. Mechem's Public Offices and Officers, section 662. Where is the basis for the statutory enlargement? Clearly not in the constitutional provision unless it is read therein by interpretation. Perhaps such would be done, but what must be said of successive interpretations of the same constitutional provision which in one circumstance, treats it as adamantine, and in another, would consider it as characterized by the qualities of plasticity and expansion?

The whole matter considered, I am constrained to the belief that the ends of justice would best be conserved by pronouncing in this case a basis for interpretation of said constitutional provision, in accordance with the principles I have herein advocated.